Filed 9/30/25  In re S.F. CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.F. et al., Persons Coming Under the Juvenile Court Law. | A170028, A170728, A171093, A171461, A171571, & A171708 |
| SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br> Y.F., <br><br> Defendant and Appellant; <br> S.F. et al., a Minor, etc., <br><br> Respondents. | (San Francisco City & County Superior Ct. Nos. JD23-3361, JD23-3361A) |

After reports that appellant Y.F. (Father) was using harsh parenting methods during his custodial time with his two older children, respondent San Francisco Human Services Agency (Agency) intervened.  The children were placed with their mother (Father's ex-wife, Mother), who ultimately obtained a juvenile restraining order protecting both herself and the minors.  The juvenile court took jurisdiction of the minors and dismissed the case, awarding custody to Mother.  In these consolidated appeals, Father challenges all appealable orders entered during the pendency of the proceedings:  the temporary restraining orders entered before the issuance of

1

a permanent order, the final restraining order, and the jurisdictional and dispositional orders. We reject his arguments and affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother were married and lived together from 2012 to 2019, apparently mostly if not entirely in Santa Clara County. They had two children, S.F. (Older Sister) and X.F. (Younger Brother). Mother later reported that Father "spoke to himself a lot, every day." According to Mother, "Most of the time he [would] just call out random names, my name, his manager's name, whatever. Sometimes he [would] tell them things like, I don't like you, I love you, or I want to sleep with you, and he [would] call out some name." If Father ever said something bad about their two children, Mother would ask him to stop, but he would usually ignore her. She later told a social worker that she felt isolated when she was married to Father because he did not want her to be with her friends and family and "didn't like other people," which impacted her own mental health. She said Father also did not want her to return to work after having children, and even after she returned to work she was the one expected to clean and cook. She further described "a lot of sexual demands, sexual coercion" (such as insisting on having sex even when she did not want to or the kids were calling for her), as well as at least one physical altercation.

Father left Mother at the end of 2019 and traveled to China. When he returned in early 2020, he went to San Francisco and did not see his two children for around two years, with the exception of a few phone calls. During that time, he had a relationship with another woman, and that woman in fall 2020 had Father's third child (Younger Half Sibling), who is not the subject of this appeal (*post*, fn. 1).

Family law proceedings regarding divorce and custody issues between Mother and Father apparently took place over a period of around two years, and they divorced in October 2023.  The two older children started overnight visits with Father around April 2022.  According to Mother, Father would yell at their children when there were disputes about issues in the divorce proceedings.  He also would say he would pick up the children at school on the peninsula, but in fact he would direct the paternal grandparents to bring them to his home in San Francisco by public transportation.  That meant the minors "had to walk in the night in San Francisco city, and they shared some experience, they [felt] unsafe, they saw homeless, weird things happen on their way to dad's house."

As visitation with Father increased, Younger Brother started to accidentally wet himself more often, and in summer 2023 he was wetting himself at least two to three times a day.  As of late 2023, Father and Mother shared equal custody of then 10-year-old Older Sister and then seven-year-old Younger Brother.  Father also sometimes had custody of then three-year-old Younger Half Sibling.

All three minors came to the attention of the Agency in November 2023 when the paternal grandmother, who was then living with Father, reported that Father was showing signs of obsessive compulsive disorder.  According to the grandmother, Father had started showing signs of anxiety and obsessive-compulsive behaviors when he was a teenager, and they had gotten worse since then.  She told a social worker that Father "was not able to work normally and [was] not able to live a normal life, that he had a high level of anxiety, and that he was obsessive" (specifically, that he had obsessive-compulsive disorder).

The grandmother reported how Father's compulsive behaviors affected his parenting style. Father was reported to be forcing Older Sister and Younger Brother to spend hours cleaning the house, including sweeping the floor; lifting up the sofa to clean underneath; and cleaning baseboards, cupboards, the kitchen floor, the microwave, the oven, and the toilet. If the children did not clean to Father's satisfaction, he would point to those areas and insist that the children clean them again. They also were expected to take care of Younger Half Sibling (even if they themselves were sick), including caring for her when she woke up in the night and potty training her.

Father also reportedly made the older two minors undress in front of him (and the paternal grandparents, if they were present) when they arrived at his house and shower before they were allowed to touch anything in the house. Since only one of the two bathrooms in Father's home was designated for showering, one of the children would have to wait naked—sometimes up to 40 minutes—while the other sibling showered, even if the waiting child was "freezing cold." Father would not allow the grandmother to wrap the waiting child in clothing while waiting to shower. According to the grandmother, this happened over the course of a year, as late as December 2023. And two or three times when a child was done washing, the child would have to wait in the bathtub for up to 30 minutes for Father to inspect the child, and Father would not allow the grandmother to take the child out of the tub. She later explained she believed that Father suffered from "severe mysophobia," which she described as "cleanness, cleanliness that is different from what every other person does that he or she would have to clean up every spot there is. [¶] He feels like . . . there are germs on to [*sic*] the children's clothing, for instance."

4

The minors also apparently had to report to Father before and after they used the bathroom for any reason, including describing to him the color of their urine. In late November 2023 Younger Brother was sick and got up in the middle of the night needing to relieve himself, but he felt he first needed to report to Father. Younger Brother was not able to wake Father up before he had diarrhea in his pants.

Father had a routine where the children would be required to run laps (though he later denied that he forced them to run when they did not want to). The maternal grandmother also reported that once when Younger Brother complained of a stomach ache and sore throat, Father insisted Younger Brother run laps as usual. He reportedly ignored the grandmother's protests that the boy be allowed to rest or he would end up in the hospital. Later, the grandmother was allowed to buy over-the-counter medication to treat what she believed were signs of food allergies, and Younger Brother felt better after he was allowed to take the medicine. The paternal grandmother felt "strongly" that the minors and Younger Half Sibling should be away from Father, and that Father should receive mental-health services.

The children and the paternal grandmother also reported that Father yelled frequently at the children, and one time when they were traveling on Caltrain another passenger told Father to stop yelling at Younger Brother. The grandmother said the yelling was not the "demeaning" type, but "his volume is too high and the children, they were scared to the point of they are about to cry and the sister, the older sister, is to the point of about to cry." Father had a "rigid schedule" for the minors, including a naptime when they did not necessarily want to sleep, and they feared that Father would yell if they did not comply with his demands.

When the minors would return to Mother after their time with Father, the minors would cry and say they no longer wanted to visit Father. They also looked anxious and nervous when Mother asked about their time with Father. Further investigation revealed that Father told the children not to discuss what happened when they were with him (something he later denied), and that if anyone asked they should say to ask Father. The minors' school reported that Younger Brother appeared sad and withdrawn, and one time came to school with "very bad body odor" after spending time at Father's, possibly because he wet himself. Older Sister's teacher said the girl described living in what sounded like an "Army-like environment." A social worker interviewed both children at their school along with the school principal and found both children's description of incidents with Father to be credible. Older Sister was "very clear" with the social worker that she was scared of her father and that he yelled a lot. And when the worker asked Younger Brother questions he did not want to answer, he would "repeatedly blink[] his eyes nonstop," consistent with what school officials had said he did when he felt anxious.

Mother and Father argued over sharing physical custody of the children around Christmas 2023. She later explained that Father texted her multiple times and "[e]very message is pretty long. It's usually like he'll keep sending me text[s], like five text messages. If I didn't reply, he'll call me. Sometimes he said, if you don't reply [to] me before, I will set a deadline I will—he said he will go to the school and pick up the kids directly to his house. [¶] But we already [had] verbally agree[d], I will send the kids to him on Friday night because if he picks up the kids, they will take public transportation, it's hours of transportation, no food, no drinks. I feel like he torture[s] the kids to punish me."

The Agency in December 2023 filed a dependency petition as to both of the older children[1] under Welfare and Institutions Code section 300.[2]  The petition was later amended multiple times.[3]  As later amended, the operative petition alleged that the children were at a substantial risk of suffering serious physical harm or illness as a result of Father's failure or inability to adequately supervise or protect them (§ 300, subd. (b)(1)), as demonstrated by various behaviors and parenting practices exhibited by Father.  The petition also alleged that the children had suffered serious emotional damage (§ 300, subd. (c)) because of Father's treatment.

Also in December 2023, Mother applied for an emergency protective order in Santa Clara County family court.  That court granted the request, and a hearing on a temporary restraining order (TRO) was scheduled for January 4, 2024, in family court.  Then later in December, Mother also filed a request in the juvenile court for a protective order to protect herself and the minors.

At the detention hearing on December 21, 2023, Father's counsel stated he would submit on detention as to the older two children given that "there is a TRO which is in existence," presumably a reference to the TRO in effect in the family law proceeding in Santa Clara County.  The court asked about the

---

[1] The Agency also filed a separate petition as to Younger Half Sibling, and the two cases were joined in the juvenile court.  The juvenile court ultimately dismissed the petition filed as to the sibling before deciding jurisdiction as to the older two siblings, and the younger sibling appealed the dismissal.  This court affirmed the dismissal in an nonpublished opinion.  (*In re H.F.* (Aug. 25, 2025, A171316).)

[2] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[3] Father filed a demurrer to the original petition, as well as to amended versions.  The juvenile court overruled the demurrers.

7

end date for the TRO and was told January 4, the date of the hearing set in family court. The court stated it would take note of the TRO and that "I am certain the Santa Clara Family Court will recognize that once a petition is filed in a Juvenile Court, the Juvenile Court is the only one that has jurisdiction over making orders regarding parents' contact with children. And I will address what we do on or about January 4th and with setting a hearing and what we do with the temporary order that will expire on January 4th." The court ordered the minors detained and placed with Mother. The court further directed that Father have no visitation pending further proceedings regarding the court's "ability to address the issues as they were raised in front of the Santa Clara Court that resulted in the granting of a [TRO]."

Later in the hearing, Mother's attorney asked if Father would "waive the extension of the temporary restraining order" until after a scheduled settlement conference on February 15, 2024, and Father's attorney agreed. Mother's counsel then "ask[ed] that the temporary restraining order be issued and be valid effective until February 15th," and the juvenile court stated, "All right." The court issued a TRO protecting Mother and the minors until a hearing date of February 15 (later continued several times pending the outcome of the hearing on the final protective order). The TRO previously issued in family court expired on its own terms after the court was informed of the order in these proceedings.

At some point after dependency proceedings began and the TRO had issued, Father communicated through his mother to Mother that he would accept $200,000 from Mother in exchange for her getting custody of their two children.

8

Father in January 2024 filed a motion requesting that he be permitted contact with the minors despite the TRO. At a January 31 hearing on the request, the minors' counsel objected to visitation and said that during "extensive conversations," the minors were "both quite articulate and very clear that they have no desire to see their father at this time." The court denied the request and stated that Father should undergo a mental-health assessment before visitation could begin.[4]

Father told a social worker that he "had 'zero' experience with mental health issues" and that his regular doctor had never recommended he receive therapy. He denied that he required the minors take off their clothes when they entered his house and said that they took off their clothes to shower after their daily outdoor exercise. Father also denied that the minors were required to seek permission before using the bathroom. He said he focused on giving his children more water after their pediatrician said during an annual exam that the minors' urine would be clear if they drank sufficient amounts. Father also started tracking on a spreadsheet when Younger Brother would pee and when he wet his pants because he was having issues with urinating on himself. He said in the two weeks after he started tracking the data points, Younger Brother had only one accident. Father continued to track Younger Brother's urine output and the color and frequency of his accidents.

Father denied that the children were afraid of him and reported that they were "very happy when they spend time with him." When asked about Younger Brother's reported frequent blinking because of stress, Father

_____

[4] Father on March 18, 2024, filed a notice of appeal challenging the issuance of a TRO on December 21, 2023, and the January 31, 2024 denial of a "carve out" for visitation. (No. A170028.)

explained that the boy had lifelong allergies. A social worker later described the contrast between Father's and the minors' description of time spent at Father's home. Father hung pictures the children had drawn and this was "presented as they love drawing pictures for me," whereas the minors reported that Father "makes us do this and it's—he asks us to present the photos to him. [¶] So every task seems to have like a goal attached to it or a performance, or a—just an aspect of structure, like this is what we're going to do now. Now you present it to me." After Father started therapy, he reportedly denied to his therapist all of the Agency's allegations.

The Agency recommended in March 2024 that the juvenile court take jurisdiction, then dismiss the matter with custody orders. The Agency also recommended that Father undergo a psychological evaluation since there were concerns that Father's accounts of what occurred in his home with his children and his relationships with the two mothers involved in the proceedings were "not entirely genuine."

At a brief hearing in March 2024, the juvenile court reissued its TRO, to expire on April 15, 2024. Around this same time, Father filed a request to end the restraining order as to him and the minors so that the court could establish a visitation schedule for them. Father also filed a "Request for Removal/Dismissal of Juvenile Court Restraining Order Issued 12/21/23." (Formatting omitted.)

Father engaged in supportive parenting services. He participated in sessions at a child-trauma research program to work on his emotional connection with his children. Father also took parenting classes and started seeing a therapist. The therapist reported that Father "seem[ed] receptive to learning new skills that will enhance his relationship with his children." The social worker reported that multiple providers observed that Father appeared

10

to love his children but needed to work on his understanding of their needs and perspectives. The social worker later testified that Father was a "good student" and "presents very well to everyone," but she was concerned that "a lot of the participation is on a more superficial level." She explained that the Agency was "not looking for a parent to check the boxes on a case plan. I want him to be curious about his children's experience. And thus far he doesn't believe them. He doesn't believe that they're feeling this way. He doesn't believe that they are fearful of him, that his behavior is doing something to make them not want to spend time with him or feel comfortable in his care."

The Agency again recommended in an addendum report filed in May 2024 that the court take jurisdiction over the minors, that joint legal custody be granted to the parents with sole physical custody to Mother, and that dependency be dismissed with visitation for Father. And the Agency again recommended that Father participate in a psychological assessment to determine whether there were any underlying mental-health needs to address.

The juvenile court on May 7, 2024, addressed Father's request to dismiss the restraining order, among other motions. The deputy city attorney stated that the Agency did not currently believe a restraining order was necessary, but counsel for Mother and the minors disagreed and argued the TRO should remain in place until evidence was presented. The juvenile court denied the request to remove or dismiss the juvenile restraining order, and it extended the TRO. But it modified the TRO "to provide an exception to allow for brief and peaceful contact to communicate about the children for Court ordered visits," and it permitted Father to have contact with the minors "during Court ordered contact or visits." As for Father's request that

11

he be allowed therapeutic visitation with the minors, the juvenile court granted the request and ordered the Agency to arrange therapeutic, supervised visitation with the minors. Father appealed from the order continuing the TRO. (No. A170728.)

A combined hearing on jurisdiction and the restraining order began the day after the hearing on motions. The social worker who conducted the initial Agency response testified that her investigation revealed that Father had a "very rigid routine for the kids" that involved cleaning the house for four hours in the morning and running laps. The social worker was concerned that "the environment that the father [was] creating for the children [was] constantly instilling anxiety and fear to them, and . . . [was] affecting their emotional health [and] well-being."

The social worker assigned to the minors' case after intake testified that living with "violence and aggression in the home," such as frequent yelling, can have an "effect . . . on development and creat[e] anxiety, depression." Her "biggest worry of this case [was] that [Father] doesn't worry about his ability to have empathy for his children, to see their perspective and for them to feel nurtured." She further testified that "I think some of father's desires are genuine to do better, but I am not sure that he's shown that he's capable at this time." She believed that the older minors had experienced trauma in Father's care. She acknowledged that Father did well in parenting classes, but he nonetheless did not reveal any insights into himself as a parent or the way his parenting impacts his children.

The paternal grandmother testified about her observations of Father's parenting and her concerns about his mental health. When Father's counsel asked the grandmother on cross-examination whether she had devised a plan with Younger Sibling's mother to have the children removed so that Father

12

would be free to care for his parents, the grandmother testified, possibly while tearing up, "You know, just take a good look at the two of us [an apparent reference to herself and the paternal grandfather]. Do we look like the ones that need his help, his care? It's him, in fact, who needs our care, our support. My heart is broken for him. You see how skinny my son is, how thin he is? That's why I want to care for him every day. I want to be able to be there for him." She acknowledged that she did not believe Father was intentionally trying to hurt his children, but actions such as making the minors undress when they entered his house was "a really bad habit of his that it is his pet peeve. It is just going to the extreme."

Mother also testified. When asked why she believed she needed a protective order, she stated, "It has been so difficult to communicate. I think his behavior was very controlling. If there is any disagreement, there will be endless call, endless text. So it will never end until I agree with him. I think it bothers me a lot." Mother explained that Father would only stop calling and texting her if she agreed with his demands or gave him more child-support money. This made her feel "mentally harmed, harmed according to previous experience during our marriage. So much controlling, coldness, selfish." Mother was further concerned that if there was no restraining order, Father would continue trying to control the older two minors' behavior. She reported that Younger Brother gradually stopped wetting himself after contact with Father ended. His performance and behavior in school also improved. As for Older Sister, she became more relaxed and improved academically.

Father testified and provided short video clips and pictures that he said represented his time with his two older children. The court ultimately admitted around 70 such exhibits from 2022 and 2023. Father described

activities he enjoyed with the children, such as baking; playing sports; drawing; reading; and visiting the dining halls at University at California, Berkeley, which Father described as the children's "favorite place." When asked whether he ordered his children to take a shower when they entered his home, Father testified, "No. No. I think it is pretty much a routine. Kids will end of day they will take a shower." On cross-examination, Father was asked whether he believed his older two children knew the difference between lying and telling the truth. As for Younger Brother, Father testified, "Not fully," and as for Older Sister, Father testified that "I would think she would know if she is lying, although there is also a possibility her memory could have been changed."

As of a hearing held on June 4, 2024, the therapeutic visitation the juvenile court had ordered the previous month had not begun, apparently because of issues with insurance coverage. Because Mother was covered by private insurance, it was unclear whether the Agency could make referrals or whether they had to rely on Mother, and "there was a lot of run around" between the public and private "systems." The court directed Mother to contact her insurance provider (which also covered the minors) to get a list of referrals who could provide therapeutically supervised visitation and to provide the list to the social worker. Apparently they tried one therapist but then ended sessions due to a combination of the "overwhelming" amount of time therapy took (one hour for each child, plus an hour with Mother) and the fact the therapist was "pretty direct in asking about what [the minors have] experienced with dad as opposed to building rapport so it just wasn't a good match."

The social worker tried to arrange visitation, but there were challenges since the minors lived in a different county from Father. When asked in late

June 2024 if she wanted to visit Father, Older Sister "violently shook her head, no, no, no." Younger Brother also was not interested in visits with Father because he was "afraid dad will yell."

Father continued to engage in services on his own, including a parenting group, individual therapy, and a fatherhood-support group. The social worker reported that Father "attempts to present himself very well to providers and there is rarely a misstep in his attendance or how he presents himself or speaks to providers," but "[t]here was little acknowledgement regarding the children stating something made them uncomfortable, such as undressing in a common area of the home or reporting to him when they had to pee or the color of the urine." The social worker acknowledged that "there are a range of parenting response[s] to various issues," but the Agency was "concerned that [Father] chooses the extreme options that make the children anxious or fearful." The social worker acknowledged that, in general, there is nothing objectionable about having structure and routine, but that "if you look at each individual task that the father is asking them to do, that it doesn't seem as much of a problem, kids have chores in the home, the exercise is good objectively. But when you put it all together and look at it overall and how it's clearly impacting the kids, like these kids are not just complaining because they have to do chores or they're being rebellious. [¶] They are saying this is abnormal and it's making us feel fearful and scared and anxious. And they're confused by it. They don't understand the rigidity, I think. [¶] So I think looking at it as the overall picture of father's needing to control each day and control their productivity and kind of control his appearance to everyone else about the kids love cleaning and love telling me about the color of their urine, the myriad of things that are laid out in the allegation that he's kind of presenting this picture perfect home." The older

15

children also felt uncomfortable that Father was "constantly filming" them, even when they were eating, and telling them they had to smile.

The juvenile court again addressed visitation at the end of a hearing in early July 2024. At that point, Father had not seen the older minors for seven months. The court said that if the previous order to have therapeutic visitation could not be implemented, it would look for alternatives. The court continued the case for around two weeks. Before the continued hearing, the older two minors filed an opposition to Father's proposed visitation. They argued that the evidence provided so far indicated emotional abuse that would make any visitation detrimental. Counsel reported that Mother had scheduled therapy sessions for both children.

At a continued hearing on July 16, 2024, the juvenile court granted Mother's request for a reissuance of the TRO. As for visitation, Mother's attorney reported that Younger Brother had had one therapy session, and Older Sister was scheduled to have one the following day. Mother also had identified a family therapist who could eventually speak with the individual therapists about starting therapeutic visitation. The juvenile court ordered that Father be provided with weekly one-hour, professionally supervised visitation with the older two minors, with family therapy to start when a therapist was identified. And the social worker was granted discretion to increase the length of visitation following the first visit, up to three hours. Father appealed from the reissuance of the TRO following the hearing. (No. A171093.)

The day after the court ordered visitation, the social worker visited the minors to discuss seeing Father. Both children said they did not want to visit and asked if Father would be picking them up and whether they would be required to go to Father's home. The social worker explained that Agency

16

staff would pick them up and the visits would occur in a park.  Younger Brother said it "feels like hell that we have to go visit him" and that staff could "take him when he was in heaven because he can control everything there."  Younger Brother tightly wrung his hands together during the visit, a behavior the social worker had not previously observed, and Older Sister cried after the social worker left.

When the social worker arrived at the home in late July to pick up the minors for the scheduled visit, Mother had them ready to leave for the visit.  But the minors ran upstairs and said they did not want to go.  Both children reported having nightmares about Father, and Younger Brother said he dreamed that Father stabbed him and killed him over and over but that he would not die.  The social worker left the home, and the visit did not take place.

Another visit was scheduled for early August.  The minors appeared anxious and said they did not want to leave, and the social worker said they would try again the following week.  The third and fourth attempts at visitation also were unsuccessful.  Representatives of the Agency, the City Attorney's Office, the dependency unit, and the visitation unit decided in late August to pause sending staff to the minors' home since the attempts "appeared to be only hardening the children's decision in not wanting to visit their father."  During a therapy session, Younger Brother drew a picture of him and members of his family inside a bank and Father as a bank robber on the outside.  The Agency opined that in-person visitation between Father and his older two children would be detrimental to them and not in their best interest.

The juvenile court addressed visitation at the end of a hearing in September 2024.  Counsel for the Agency reiterated that visitation would be

detrimental to the children, and counsel for the minors and Mother agreed. Father's counsel argued that the Agency had violated the previous visitation order and that Mother's resistance had contributed to visitation not occurring. The court ordered that visitation would be detrimental and temporarily suspended it. The decision was based, not solely on the children's wishes, but also on the social worker's assessment, input from Younger Brother's therapist, and writeups from various visitation supervisors. The court ordered that both children continue in individual therapy and that the social worker inform the therapists that restoring Father's visitation was a treatment goal. After the close of evidence on October 2, the court continued the matter for closing argument and also continued the TRO. Father appealed from both the September 12 and October 2 orders reissuing the TRO. (No. A171461.)

Counsel for the Agency and for the minors urged the juvenile court to take jurisdiction. Mother's counsel also agreed that jurisdiction was appropriate and asked the court to issue a permanent restraining order. Father's counsel, by contrast, asked the juvenile court to dismiss the petition, deny the permanent restraining order, and "issue a nunc pro tunc on all the temporary restraining orders issued in this case."

The juvenile court ultimately sustained allegations in the operative amended petition that the minors were children described by section 300, subdivisions (b)(1) and (c). The court concluded that "the totality of the evidence show[ed] that [Father's] behaviors add[ed] up to a pattern of over controlling and rigid and unrealistic demands with an unwillingness to compromise or a relentlessness as was described during testimony that do bring [the minors] within the jurisdiction of this court."

18

The court also issued a domestic violence restraining order (DVRO, form No. JV-255) protecting Mother and the minors for three years. The court provided an exception for "brief and peaceful contact" with Mother regarding court-ordered visits, and for having contact or visits with the children during court-ordered contact or visitation. The protective order indicates that visitation had been ordered in the case, and describes it as follows: "Therapeutic visitation as arranged by the Agency; however, visits are currently suspended. The Agency shall develop a plan towards visitation." Father appealed from the restraining order. (No. A171571.)

Father continued in individual therapy every other week. The therapist reported that he (the therapist) "provides a lot of education regarding parenting," and the two discussed activity planning and approaches to discipline. The therapist tried to guide Father to "focus[] on what has moved forward in the [dependency] case and next steps," and that Father said "he [was] open to hearing from the children about their experience." The Agency was concerned, however, about Father's lack of accountability and the fact that "[w]hile he states that he would like to hear about the children's experience directly from them, he does not appear to believe their statements that they have made to their mother, the assigned social worker, their attorney, their therapists, or teachers."

The children continued to state that they did not want to visit with Father. The Agency again recommended in a disposition report that the minors live with Mother, that the petition be dismissed with legal and physical custody to her, and that no visitation be ordered for Father. The report stated that it did not appear productive to pressure the children to have contact with someone they did not feel safe with, and it raised the possibility of conjoint therapy or exchanges of letters in the future.

19

At the dispositional hearing in early November 2024, counsel for both Mother and the minors stated they agreed with the Agency's recommendation. The juvenile court adjudged the children dependent minors and found by clear and convincing evidence that there would be a substantial danger to the minors' physical health, safety, protection, or physical or emotional well-being if they were returned to Father's care, and there were no reasonable means by which they could be protected absent removal. The court further concluded that because the children were safe in Mother's home, there was no need for ongoing dependency jurisdiction, and it dismissed dependency proceedings. The court granted sole legal and physical custody of the minors to Mother. The court further ordered that the minors continue to participate in individual therapy, and that an ultimate goal was for Father to have supervised therapeutic visitation with the children by February 2025. Father appealed. (No. A171708.)

## II.
### DISCUSSION

*A. We Shall Not Dismiss the Appeals of the Expired TROs, But We Will Not Consider Interim Visitation Orders (Nos. A170028, A170728, A171093, A171461).*

Before we address the merits of the final restraining order against Father, we consider whether some of Father's appeals are now moot. Although it is a close question, we conclude that it is appropriate to reach the merits of the issuance of the TROs, but not the interim visitation orders.

The interim TROs, as well as orders declining to dissolve them, were appealable. (Code Civ. Proc., § 904.1, subd. (a)(6) [orders granting, denying, or refusing to dissolve an injunction are appealable]; *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 332; *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 208 [restraining order in dependency proceeding directly appealable to

20

the same extent as restraining order in civil action under Code Civ. Proc., § 904.1, subd. (a)(6)].)  We asked Father to brief whether his challenge to the TROs issued in these proceedings are moot, as the temporary orders expired long ago.

"A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' [Citation.]  A case becomes moot when events ' "render[] it impossible for [a] court, if it should decide the case in favor of [appellant], to grant him [or her] any effect[ive] relief." ' [Citation.]  For relief to be 'effective,' two requirements must be met.  First, the [appellant] must complain of an ongoing harm.  Second, the harm must be redressable or capable of being rectified by the outcome the [appellant] seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)

"This rule applies in the dependency context.  (*In re N.S.* (2016) 245 Cal.App.4th 53, 60 ['the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error'].)  A reviewing court must ' "decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding." ' " (*D.P. supra*, 14 Cal.5th at p. 276.)  In general, where the time period of an injunction elapses, any challenge to it is rendered moot.  (*City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1078–1079; *Covina UnionHigh School v. Interscholastic Federation* (1934) 136 Cal.App. 588, 589.)

"Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute.  [Citation.]  As a rule, courts

21

will generally exercise their discretion to review a moot case when 'the case presents an issue of broad public interest that is likely to recur,' 'when there may be a recurrence of the controversy between the parties,' or 'when a material question remains for the court's determination.' " (*D.P.*, *supra*, 14 Cal.5th at p. 282.)

In A170028, A170728, A171093, and A171461, Father appealed from the interim TROs entered before the issuance of the permanent restraining order. In both his supplemental brief on mootness and in his opening brief, he advances several reasons why we should reach the merits of these appeals despite the fact they expired by their terms many months ago. The most persuasive of these is that the existence of a restraining order could potentially be used in family-law proceedings even after the order has expired. (See Fam. Code, § 3044, subd. (a) [finding of domestic violence by party creates rebuttable presumption that custody award to that party would be detrimental to child's best interest]; *Cardona v. Soto* (2024) 105 Cal.App.5th 141, 147–148 [reviewing restraining order despite its expiration since it may trigger adverse presumption in future proceedings].) Since any family-law proceedings involving Father are separate from these dependency proceedings, the record sheds little light on how, or whether, the existence of the TROs was or will be used in those separate proceedings. But the possibility is not so speculative that we will decline to consider any arguments regarding the order.

The analysis is different for the portions of the orders appealed from that addressed visitation. For example, Father in A170028 challenges both the TRO and the order denying an exception to the TRO for visitation. But there is no effective relief that this court could grant to Father even if we agreed that visitation should have been granted at that stage in the

22

proceedings. The juvenile court later considered visitation to be appropriate and, even though visitation was not ultimately successful, the court's final order contemplates future visitation. Any reversal of an interim order would not rectify any ongoing harm. (Cf. *D.P. supra*, 14 Cal.5th at p. 276.)

Likewise in A170728, Father appealed from a May 2024 order that continued the TRO. Although we shall not dismiss the appeal as moot, we decline to review the portion of the order that *granted* Father's request that he be allowed therapeutic visitation with the minors and ordering the Agency to arrange therapeutic, supervised visitation with the minors, since that ruling was favorable to Father. And as Father acknowledges, interim orders on visitation are not separately appealable before the dispositional order and are only cognizable in the appeal following disposition. (E.g., *In re M.C.* (2011) 199 Cal.App.4th 784, 801.)

In sum, although we will consider the TROs in A170028, A170728, A171093, and A171461, we will not consider ancillary orders issued at the same time, even if they were arguably referred to in the notices of appeal.

### B. Sufficient Evidence Supports the Issuance of the TROs and the Final Juvenile Restraining Order.

Father argues that the TROs and restraining order issued against him are not supported by sufficient evidence. The minors have filed a respondents' brief in support of the order, and the Agency takes no position.

### 1. The Applicable Law and the Standard of Review.

The restraining orders were issued under section 213.5. Subdivision (a) of the statute permits a juvenile court in a dependency action to enjoin a person from, among other things, "harassing" or "disturbing the peace of [a]

23

child."[5]  (See also Cal. Rules of Court, rule 5.630 [juvenile court's authority to issue restraining order].)  While evidence that a restrained person previously has inflicted harm on a minor is sufficient to justify a restraining order under section 213.5, "issuance of a restraining order does not *require* such evidence. [Citations.]  Nor does it require evidence of a reasonable apprehension of future physical abuse.  [Citations.]  There need only be evidence that the restrained person 'disturbed the peace' of the protected child." (*In re Bruno M.* (2018) 28 Cal.App.5th 990, 997.)  "In this context, *disturbing the peace* means ' "conduct that destroys the mental or emotional calm of the other party." ' " (*Ibid.*)

Different courts have applied different standards of review when reviewing a restraining order in a dependency action.  (Compare *In re B.S.* (2009) 172 Cal.App.4th 183, 193 [reviewing issuance of restraining order for substantial evidence] with *In re Carlos H.* (2016) 5 Cal.App.5th 861, 866 [factual findings supporting restraining order reviewed for substantial evidence, while issuance of order reviewed for abuse of discretion].)  The approach in *Carlos H.* is consistent with our Supreme Court's approach to reviewing decisions made under the dependency statute governing selecting a permanent plan (§ 366.26).  In *In re Caden C.* (2021) 11 Cal.5th 614, the court held that the factual elements of the beneficial-relation exception to adoption

---

[5] The court may (1) enjoin a person from "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying the personal property, contacting, either or directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the child or any other child in the household; and (2) exclude[] a person from the dwelling of the person who has care, custody, and control of the child." (§ 213.5, subd. (a).)

are reviewed for substantial evidence, while weighing the various factors of applying the exception is reviewed for abuse of discretion. (*Id.* at pp. 639–640.) A similar approach is appropriate here, where the basis for a restraining order involves "essentially a factual determination," and the decision to impose a restraining order involves "a delicate balancing of these [factual] determinations as part of assessing the likely course of a future situation that's inherently uncertain." (*Id.* at p. 640.) And, in any event, "the practical difference between the standards is not likely to be very pronounced." (*Id.* at p. 641.) We review the evidence in a light most favorable to respondent, and we indulge all legitimate and reasonable inferences to uphold the juvenile court's order. (*In re C.Q.* (2013) 219 Cal.App.4th 355, 364.)

### 2. Father Waived Objections to the Imposition of the Initial TRO (No. A170028).

As we have said, Mother secured a TRO against Father in the Santa Clara County family court, then sought protection in the San Francisco juvenile court. At the detention hearing in December 2023, Father's counsel stated he would submit on disposition in light of the TRO in effect in Santa Clara. And then when Mother's attorney asked if Father would waive the extension of the TRO until after a scheduled settlement conference, Father's attorney *agreed*, and the juvenile court entered a TRO until February 15, 2024 (around six weeks), apparently with no objection from Father.

On appeal, Father raises several objections to the issuance of the initial TRO. He complains that the TRO in family court provided an insufficient basis for the TRO in these proceedings; that Mother's declaration in support of the TRO in these proceedings consisted mostly of hearsay; and that the grandmother's declaration in support of the TRO was not translated from

25

Chinese by a certified translator but instead by Mother, who was not a neutral party. And Father also argues that the evidence submitted was insufficient to show either that the conduct alleged supported a TRO or that the children should be protected parties. As none of these issues were raised before the issuance of the original TRO and in fact Father did not object to having it apply for a brief period of time, Father cannot raise them for the first time in this appeal.

3. The Subsequent TROs Were Not Impermissibly Based Solely on the Original Family Law DVRO (Nos. A170728, A171093, A171461).

Two days before the original TRO was set to expire (February 15, 2024), Father submitted an official response to the request for a permanent juvenile restraining order. He included a declaration complaining that the allegations against him were based on hearsay and that there was no need for a protective order in any event because he had never violated conduct orders issued by the Santa Clara family court and did not contact his children outside of court-authorized time. The TRO was continued until the conclusion of the hearing on jurisdiction and the permanent restraining order.

On appeal, without relying on any caselaw, Father argues that "[a]ll these subsequent TROs were made with no additional findings, relying solely on the original TRO which, in turn, relied on the expired, unsupported, ex parte family law DVRO." But this misrepresents the nature of how these proceedings unfolded. For example, the Agency submitted a status report in May 2024 stating that Father had completed intake with a child trauma research program and had met with a psychologist. According to the psychologist, "she did not see any safety issues" *based on what Father had shared* "thus far." At a hearing the next day, the juvenile court addressed a

26

request from Father to dismiss the TRO and asked whether the psychologist's statement about the lack of safety issues affected the need for a TRO. Mother's counsel argued that the TRO should not be dismissed without a hearing since it was "important for the Court to see whether or not there is merit, and decide that based on evidence rather than a procedural challenge." The minors' counsel likewise argued that there were "very serious concerns about the children[] . . . while in the care of their father" and that "a hearing on any restraining order issues would be the only appropriate way for the Court to evaluate the weight of the need for a restraining order." As for whether the psychologist's statements affected counsel's position, counsel stated she had concerns about whether there was evidence about "the weight of that opinion." Following further argument from Father's counsel, the juvenile court denied the request to dismiss the TRO. But later in the hearing, the juvenile court *granted* Father's request for therapeutic supervised visitation with the minors. The following day, the social worker began her testimony. This was illustrative of the juvenile court's process of taking into consideration new information and weighing motions and argument from the parties before extending the TROs, and not simply rubber stamping the initial DVRO from family court, as Father suggests on appeal. We reject his meritless challenges to the remaining TROs.

> 4. Sufficient Evidence Supports the Final Restraining Order (No. A171571).

As for the final restraining order, there was abundant evidence that Father's controlling, intrusive parenting style caused the minors to fear him and certainly disturbed their peace. (*In re Bruno M.*, *supra*, 28 Cal.App.5th at p. 997.) And the evidence further showed that Father had a history of abuse toward Mother that did not end after their divorce when they were

supposed to be working together on shared custody of the children, to the point where Father would send "endless text[s]" and calls when they had disagreements.

On appeal, Father does little to address the evidence presented over several days at the hearing on the permanent restraining order. He first complains that Mother was an improper subject of the order. He begins by attacking the underlying allegations (as opposed to the supporting evidence). He points to the custody-and-support order entered in the Santa Clara family court establishing the parents' shared custody and speculates that "[p]resumably, if there had been any substance to [the allegations alleged in this action], mother would have raised them earlier." Again, this simply ignores Mother's testimony that she did not contact the Agency because she had "lost at family law" but instead because she "heard a lot from [her] kids" and "[t]heir experiences [with Father] were concerning."[6] The children suffered anxiety as Father's custodial time increased, and Younger Brother struggled with bed wetting and eye blinking that diminished after he was removed from Father's care. In other words, the restraining order was entered *after* testimony about events that postdated the orders entered in the parents' divorce proceedings. Father also discounts evidence that he isolated Mother during their marriage as not being supported by substantial evidence, but since there was testimony to support this point we must defer to all reasonable inferences to support the order.

---

[6] Following this testimony, Mother added that she "also heard from grandma" and consulted with her family-court attorney, who advised her what to do. The juvenile court then sustained a hearsay and nonresponsive objection. The objection was presumably to Mother's testimony about what her attorney told her to do.

28

Finally, Father claims that the evidence was insufficient to include the children in the protective order. He briefly asserts that the allegations in the sustained petition did not amount to the type of abuse that would call for protection by a restraining order. Again, though, the issuance of a restraining order does not require evidence that a party has inflicted physical harm on a protected child, but merely that the restrained person disturbed the peace of the child. (*In re Bruno M.*, *supra*, 28 Cal.App.5th at p. 997.) Viewing the restraining order in the light most favorable to affirming its issuance, and in light of the substantial evidence supporting it, we reject Father's arguments.

### C. Substantial Evidence Supports the Jurisdictional Order (No. A171708).

Father argues that the sustained allegations against him "are either insufficient to support dependency as a matter of law, based on stale facts, or unsupported by substantial evidence." We are not persuaded by any of these arguments.

To begin with, as we have said, Father challenged the allegations against him by way of motions akin to a demurrer. (*Ante*, fn. 3.) "When the facial sufficiency of a petition filed under section 300, subdivision (b) is challenged on review, we construe the well-pleaded facts in favor of the petition to determine whether the Agency pleaded that the parent or guardian did not supervise or protect the children within the meaning of section 300, subdivision (b). [Citations.] A facially sufficient petition 'does not require the pleader to regurgitate the contents of the social worker's report into a petition, it merely requires the pleading of essential facts establishing at least one ground of juvenile court jurisdiction.' " (*In re Kaylee H.* (2012) 205 Cal.App.4th 92, 108.) We review the sufficiency of the

29

pleading as we would a ruling on a demurrer, that is, as a matter of law. (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1133.)

Father also argues that the jurisdictional findings were not supported by substantial evidence. The court found that the minors were children described by section 300, subdivisions (b) and (c). We must affirm if there is substantial evidence to support the court's order. (*In re A.G.* (2013) 220 Cal.App.4th 675, 682.) That is, we must affirm if there is evidence that is reasonable, credible, and of solid value to support the order, resolving all conflicts in favor of the order and deferring to the juvenile court's determination of credibility. (*Id.* at pp. 682–683.) "We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53, disapproved on another ground in *In re Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5.)

" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Because we conclude that substantial evidence supported jurisdiction under section 300, subdivision (b)(1), we affirm. (See

30

*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103 [affirming jurisdictional order after considering one of two grounds upon which juvenile court took jurisdiction].)

Section 300, subdivision (b)(1) provides that the juvenile court may take jurisdiction of a minor where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness" as a result of "[t]he failure or inability of the child's parent . . . to adequately supervise or protect the child." "There are three elements to jurisdiction under section 300: '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' " (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.) "The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).' " (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)

Father first argues generally that family court has procedures to safeguard children, without the need to resort to dependency proceedings. He cites to documents from the parents' divorce proceedings that were presented to the juvenile court. Father's attorney questioned witnesses about the divorce proceedings and argued to the juvenile court that the case should have remained in family court. On appeal, Father ignores all the evidence, which was substantial, that contradicted the assumption that this was simply a custody dispute that should have remained in family court.

The two specific allegations the juvenile court sustained under section 300, subdivision (b) were that (1) the minors are at substantial risk of suffering serious physical harm or illness because of Father's undiagnosed

31

mental-health issues and that (2) "Father's undiagnosed psychological issues manifest in an unhealthy, overly-rigid, stressful, and fear-inducing environment for the children." And the petition cited several *examples* supporting those findings. On appeal, Father mischaracterizes those examples in the same manner that he did below. For example, he insists that in April 2023 he stopped asking the children to undress when they entered his home after the issue was raised in family court. True, the paternal grandmother testified that "there were a couple of instances where it [having the children undress] stopped." She continued, though, that "because of his psychological profile, *it kept going*." (Italics added.) Mother likewise testified that having the children undress stopped "for a while" ("[a] little time"), and she was "not sure if it [was] because of the Judge from the Family Court or it is because [of] me discussing with [Father]." She then testified that the undressing *resumed*, which is consistent with the grandmother's testimony that it occurred as late as December 2023. This testimony directly contradicts Father's argument that issues could adequately be addressed in family court.

Father also suggests that allegations he yelled at the children and forced them to run laps "necessarily were not current" since the children had not seen Father for several months by the time the jurisdictional allegations had been sustained. This of course was because of the TROs and the difficulty in encouraging the minors to attend court-ordered visitation. Father seems to suggest that if a parent's conduct ends because children are removed from the parent, it could never be proven that there was a current risk of harm since the parent has not had custody of the children, a suggestion we reject. Specifically, we disagree with Father's appellate assertion that it "strains credulity" that he would continue his behaviors,

given the services he engaged in.  Again, this simply ignores all the evidence that Father lacked any insight into his parenting despite all those services.

Father also spends several pages of his opening brief to listing the individual supporting examples of risk of harm and arguing that each, individually, were both insufficient as a matter of law to support dependency jurisdiction and also were unsupported by substantial evidence.  His trial attorney took the same approach in the juvenile court, asking the social worker about whether each individual allegation amounted to child abuse.  On redirect, the social worker explained that "I think it's important to look at the pattern of behaviors *as a whole* and the petition *as a whole* and the impact on the kids of increasing fear and anxiety in them and not understanding why dad is treating them that way.  [¶] So I think that goes back to the kids, now that they're not having contact with dad, feeling comfortable talking about how they're feeling and how his behaviors have impacted them, feeling safe to do so."  (Italics added.)  Father on appeal again fails to view the impact that all the allegations, taken together, had on his children.

So, for example, Father points to the sustained allegation that he talks to himself and yells out random names in his home.  We accept his argument that, *standing alone*, this allegation may be insufficient to establish dependency jurisdiction.  And perhaps the other examples of Father's untreated mental-health issues, *standing alone*, might not be enough.  But taken together, they established a pattern of Father making unrealistic and inappropriate demands of his children—such as over-monitoring their bodily functions, making them undress at inappropriate times and locations, forcing them to exercise and do chores in a manner that was not age-appropriate and in at least one instance jeopardized Little Brother's health—that led them to

33

fear him.  These findings are all the more serious in light of the evidence presented that Father had gained no insight into how his behavior affected his children and did not acknowledge that his behaviors were at all objectionable.

Counsel for the Agency argued below that Father had "pedantic" responses to questions about the effect he had on his children, and his appellate arguments follow a similar approach.  He contends that having a child run laps "even if [the] child is ill, does not subject a child to *serious physical harm*," and he quibbles about how many laps he had the children run and whether Younger Brother had the flu or merely suffered allergies when he was forced to exercise.  Again, this shows a remarkable lack of insight into the effect Father had on his children, and it ignores that the paternal grandmother was so concerned about the forced exercising that she feared Younger Brother would be hospitalized if he were not allowed to rest. We agree with the Agency that Father's main complaint is that the juvenile court "refused to accept [his] biased interpretation and narrative of the facts of this case, and he is essentially asking this Court to reconsider the evidence and draw different inferences from the facts and testimony than the juvenile court," something we are not permitted to do. (*In re Casey D.*, *supra*, 70 Cal.App.4th at pp. 52–53.)

In sum, there was substantial evidence that the children were at current risk of a substantial risk of serious harm as a result of Father's inability to care for them.

*D. Substantial Evidence Supports the Dispositional Order*
   *(No. A171708).*

Finally, Father challenges the dispositional order removing the minors from his care and awarding sole custody to Mother. We once again conclude that substantial evidence supports the order.

A child adjudged a dependent minor shall not be taken from the physical custody of his or her parents unless the juvenile court finds by clear and convincing evidence that there "is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody." (§ 361, subd. (c)(1).) At the time of removal, the court shall determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home." (§ 361, subd. (e).) The juvenile court has the discretion "to terminate its jurisdiction at the close of a disposition hearing when it finds services and continued court supervision are not necessary to protect the child." (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 208.)

We review a dispositional order removing a child from parental custody for substantial evidence, keeping in mind the juvenile court was required to make its finding based on clear-and-convincing evidence. (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.) Removal "is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent. The law requires that a child remain in parental custody pending the resolution of dependency proceedings, despite the problems that led the court to take jurisdiction over the child, unless the court is clearly convinced that such a

disposition would harm the child." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.)

On appeal, Father advances the same theory—unsupported by the evidence—that he unsuccessfully advanced below, that the origins of the case were "highly suspect" because it arose shortly after the parents' divorce became final and because the paternal grandmother reported his behavior only after she saw a therapist "[a]pparently with no prior need for therapy." And he selectively quotes excerpts from testimony to support his claim that a "logical inference" to be drawn is that Mother "launched this dependency case to secure additional leverage over [F]ather." This supposed tie to divorce proceedings was explored when Father's counsel cross-examined Mother, and the juvenile court impliedly rejected this inference when issuing its dispositional order. Father also states that he "dutifully participated in all programs and therapy, learning from those efforts"—again ignoring evidence that he was simply going through the motions and not internalizing any lessons. As with Father's challenge to the jurisdictional order, he essentially asks this court to reweigh the evidence and draw different inferences from the evidence, something we are not permitted to do.

We likewise reject Father's argument that there was no substantial evidence supporting the juvenile court's finding that reasonable efforts were made to prevent removal since he was not able to visit with the children. "[R]easonable efforts, like reasonable services, need only be reasonable under the circumstances, not perfect." (*In re H.E.* (2008) 169 Cal.App.4th 710, 725.) Father again claims that he was wrongfully denied visitation at the outset of the case because of a supposedly inappropriate TRO, an argument we already have rejected. True, the Agency ultimately was unable to facilitate the visitation later ordered by the juvenile court since the minors adamantly

refused visitation despite Mother preparing them for scheduled visits. Given the social worker's repeated efforts to arrange and facilitate visitation, we cannot say that the Agency's efforts were unreasonable. The case is distinguishable from *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504–1505, upon which Father relies, both because the juvenile court here did not delegate discretion over visitation to a third party and because the lack of visitation did not result in the termination of Father's parental rights. To the contrary, the exit order contemplates visitation between Father and his children.

Given all the evidence presented to the juvenile court, its dispositional order is supported by substantial evidence.

## III.
### Disposition

In Nos. A170028, A170728, A171093, and A171461, the temporary restraining orders are affirmed.

In A171571, the restraining order is affirmed.

In A171708, the jurisdictional and dispositional orders are affirmed.

_____

Humes, P. J.


WE CONCUR:


_____

Langhorne Wilson, J.


_____

Smiley, J.


*In re S.F.*  A170028, A170728, A171093, A171461, A171571, A171708
(Consolidated)